

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 23, 2009                                    **United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES ALTON KERCHEVAL, | § | Case No. 08-33516-HDH-7 |
| | § | |
| Debtor. | § | |
| | § | |
| JERRY D. RUCKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 08-03441 |
| | § | |
| CHARLES ALTON KERCHEVAL, | § | |
| | § | |
| Defendant. | § | |

### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The Court has jurisdiction over this matter pursuant to the provisions of 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I) and (J). The parties previously agreed to try Plaintiff's Objection to Debtor's Amended Claim of Exemption in

tandem with the Complaint in this adversary proceeding objecting to Debtor's discharge pursuant to 11 U.S.C. § 727 and to determine the dischargeability of certain indebtedness, pursuant to § 523.

The Court adopts the Statement of Undisputed Facts in the parties' Joint Pre-Trial Order, filed in this proceeding on August 11, 2009. In addition, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014:

## I. FINDINGS OF FACT

### *Defendant, PFI, and the Loans Made by Plaintiff*

1. At all times relevant to this proceeding, Provident Financial, Inc. ("PFI") was a factoring business; it bought accounts receivable from other businesses in return for interest and fees.

2. From 2000 until at least September 24, 2008, Defendant was an officer of PFI.

3. From September 2007 until at least September 24, 2008, Defendant was the CEO of PFI and was making the decisions for PFI.

4. In September 2007, Defendant assumed all of the duties of the president of PFI.

5. On or about March 22, 2000, PFI and Defendant executed a Security Agreement in favor of Plaintiff.

6. The Security Agreement covered all of Defendant and PFI's present and future assets.

7. The Security Agreement signed by PFI and Defendant prohibits the transfer of any assets outside the ordinary course of business without Plaintiff's prior written consent.

8. On March 10, 2000, Plaintiff filed a UCC-1 financing statement with the Texas Secretary of State covering "[a]ll assets . . . including Insurance Proceeds...." of PFI. However, Plaintiff did not perfect its interest in any insurance policy, as provided in the Texas Insurance Code.

9.     On March 21, 2000, Defendant Kercheval executed a personal guaranty in favor of Plaintiff guarantying all present and future debts of PFI to Plaintiff.

10.    PFI requested and Plaintiff agreed to renew and extend the loan represented by the April 1, 2007 Note.

11.    On April 1, 2007, Plaintiff extended a renewal loan to PFI in the amount of $521,989.53 plus 9% annual interest ("April Note").

12.    The April Note had a maturity date of February 1, 2008.

13.    PFI requested and Plaintiff agreed to renew and extend the loan represented by the July 10, 2007 Note.

14.    On July 10, 2007, Plaintiff extended a renewal loan to PFI in the amount of $650,450.28 plus 9% annual interest ("July Note").

15.    The July Note had a maturity date of February 1, 2008.

16.    Defendant personally guaranteed the April and July Notes in the total amount of $1,199,507.12, plus interest, attorneys' fees, costs and expenses.

17.    The April and July Notes remain unsatisfied.

18.    Jeanie Hendry was Defendant's first wife.

19.    During 2007, at least, Hendry was employed by PFI as its office manager.

20.    Kirby Kercheval is the son of Defendant and Hendry.

21.    Through most of 2007, at least, Kirby Kercheval was the vice president of operations for PFI.

22.    Kirby Kercheval created "Provident Factors and Financial Services, LLC" on March 5, 2007, while still an employee and officer of PFI.

23. Kirby Kercheval is a CPA, and he was a licensed CPA during the period he was an officer of PFI.

24. On September 24, 2007, the name for "Provident Factors and Financial Services, LLC" was changed to "KD Factors and Financial Services, LLC." KD Factors is a factoring business owned by Defendant's son, Kirby Kercheval, and his ex-wife, Jeanie Hendry.

25. In early 2007, and again in the fall of 2007, PFI was in severe financial difficulties and no longer had any funds from which to operate its business. PFI was unable to make its payroll and pay its expenses in the ordinary course.

26. Plaintiff was a second lien holder on the assets of PFI (including the accounts receivable), behind Rediscounters, Inc. ("Rediscounters").

27. Rediscounters is owned and operated by Harold Goodman and Keith Reid. Keith Reid also owns Goodman Factors.

28. In late September to early October 2007, PFI transferred $900,000.00 worth of accounts to Goodman Factors that Rediscounters credited against its first lien. Some smaller accounts were transferred to KD Factors. KD Factors made payments totaling over $441,000.00 to PFI for factor charges and commissions; and PFI used these payments to reduce the first lien debt.

29. On October 10, 2007, a meeting ("October Meeting") was held with Plaintiff, Defendant, and Harold Goodman of Rediscounters, at which Plaintiff was informed of the transfer of PFI accounts to Goodman Factors and KD Factors. Plaintiff was also informed of such transfer in various emails prior to that meeting.

30. On October 10, 2007, Plaintiff made written demand ("Demand Letter") upon PFI and Defendant demanding payment if full of the April and July Notes.

31.     Plaintiff's Demand Letter to PFI and Defendant accelerated the maturity dates of the April and July Notes.

32.     Plaintiff's Demand Letter to PFI and Defendant requested, among other things, assistance in recovering PFI's assets; assets that were Plaintiff's collateral.

33.     PFI remains in existence, but does not have ongoing operations.

34.     Neither Defendant nor PFI obtained prior written consent from Plaintiff before PFI transferred accounts to Goodman Factors or to KD Factors.

35.     There are no corporate resolutions authorizing the transfer of PFI's accounts to Goodman Factors or to KD Factors.

36.     No Uniform Commercial Code foreclosure was conducted by Rediscounters. Rediscounters was paid from the transferred accounts, or as accounts were sold or collected.

37.     PFI received value for the transfer of PFI accounts to third parties, including transfers to KD Factors. The credible testimony of the witnesses indicates that the accounts were sold dollar for dollar, and the proceeds were used to pay down Rediscounters' debt.

38.     At all times, beginning September 2007, through and including September 10, 2008, Defendant was a decision-maker for PFI.

39.     In October 2007, PFI allowed Harold Goodman to pick the PFI accounts he wanted to send to Goodman Factors.

40.     Rediscounters did not conduct a foreclosure sale, in conformity with the Uniform Commercial Code, on the accounts that were transferred to them from PFI. Instead, accounts were transferred to it, or it was paid from the proceeds of the sale of such accounts, which is permissible.

41.     After Goodman Factors took the PFI accounts that it wanted, KD Factors took the PFI accounts that Goodman Factors did not want, and paid value for those accounts.

42.     KD Factors paid PFI the value that PFI had in the accounts it was given.

43.     After the October Meeting, only a few accounts remained at PFI, including one that is worth more than $500,000 and is in litigation.

### *The Conseco Insurance Company Policy (the "Policy")*

44.     From 1998 through at least October 2007, PFI maintained the Policy on Defendant's life through Conseco.  The Policy is a "term" policy, without a cash surrender value.

45.     From 1998 until October 2007, PFI paid 100% of the premiums for the Policy.

46.     From 1998 to November 19, 2007, PFI was the owner of the Policy.

47.     Defendant has never reimbursed PFI for any premiums that PFI paid for the Policy.

48.     Defendant never paid any of the premiums for the Policy.

49.     From 1998 until at least March 28, 2008, PFI was a named beneficiary on the Policy and was designated to receive $250,000 upon Defendant's death.

50.     Due to health problems, Defendant has been rejected for life insurance coverage he attempted to obtain on his own (without using PFI).

51.     In September 2007, PFI did not have the funds necessary to make the premium payment on the Policy.

52.     On or about October 10, 2007, Defendant contacted Conseco to transfer ownership in the Policy from PFI to himself.

53.     On or about October 23, 2007, Defendant contacted Conseco to change the $250,000 death benefit on the Policy from PFI to KD Factors, and to make changes in other beneficiaries.

54. On or about November 2, 2007, by letter, Conseco rejected the beneficiary change because, for among other reasons, the submission was missing signatures of two PFI officers.

55. On or about November 15, 2007, "Elisa" called from the insurance agent's office about why the change in ownership was rejected.

56. Defendant signed the form to transfer ownership of the Policy from PFI to himself as PFI's CEO.

57. Kirby Kercheval, as vice president of operations for PFI, also signed the form to transfer ownership of the Policy from PFI to Defendant, as the second officer required by Conseco.

58. On or about November 20, 2007, Conseco notified Defendant that ownership of the Policy had been transferred from PFI to Defendant individually, effective November 19, 2007.

59. Defendant did not pay any compensation to PFI for the transfer of the ownership of the Policy to him individually.

60. Defendant was the CEO, majority stockholder and acting president of PFI when ownership of the Policy was transferred to Defendant individually.

61. Defendant had assumed all of the duties of president of PFI in September 2007.

62. Kirby Kercheval was the vice president of PFI when ownership of the Policy was transferred to Defendant individually.

63. At Defendant's direction, PFI was removed as a beneficiary on the Policy on or about February 12, 2008, and KD Factors was designated as a beneficiary, to be paid $250,000 upon Defendant's death.

64. At Defendant's direction, the beneficiaries designated to receive the other $250,000 in death benefits under the Policy were Defendant's then wife, ex-wife, and sons in various amounts.

65. PFI did not pass a corporate resolution authorizing the transfer of the Policy from PFI to Defendant individually.

66. Neither Defendant nor PFI obtained prior written consent from Plaintiff before transferring the Policy from PFI to Defendant.

67. By its terms, the Policy pays $500,000 in death benefits upon Defendant's death.

68. Defendant did not tell Plaintiff that ownership of the Policy was being transferred to Defendant.

69. Defendant did not tell Plaintiff that he was removing PFI from being a beneficiary on the Policy.

### *Divorce Decree, Knox House Sale Proceeds, and Insurance*

70. Defendant separated from his first wife, Hendry, in 1998, and moved out of their home located at 1576 Knox Road in Roanoke, Texas ("Knox Property").

71. Defendant and Hendry divorced pursuant to an Agreed Final Decree of Divorce ("Divorce Decree") signed September 5, 2002.

72. The Divorce Decree was never amended to reflect changes to its provisions.

73. Between the Divorce Decree (September 5, 2002) and 2006, Defendant remarried and moved into a home with his new wife.

74. The Knox Property sold on or about April 12, 2007.

75. The Divorce Decree awarded the Knox Property to Hendry "as her sole and separate property."

76. The Divorce Decree ordered Defendant "divested of all right, title, interest, and claim in and to" the Knox Property.

77.      The Divorce Decree provided that Defendant Kercheval be paid the sum of $75,000.00 upon the sale of the Knox Property.

78.      Defendant signed a Warranty Deed in connection with the Knox Property on or about April 12, 2007, in which he represented that " . . . all items in the Agreed Final Decree of Divorce . . . including the payment of $75,000.00 have been met."

### *Defendant's Bankruptcy*

79.      Defendant filed for bankruptcy, in part, to be protected from his guarantee obligation to Plaintiff.

80.      Defendant filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code seeking protection from his creditors on July 24, 2008.

81.      On Question 10 of the SOFA, Defendant failed to disclose the $75,000.00 of debt forgiveness to his ex-wife within two years of filing for bankruptcy.

82.      Defendant did not claim the Policy as an exempt asset in the Schedule C he filed on July 24, 2008, nor in several amendments to his bankruptcy filings, until March 2009.

83.      On August 19, 2008, the 341 Meeting of Creditors was begun, continued on September 10, 2008, and continued and concluded on September 24, 2008.

84.      On September 23, 2008, the Defendant amended his SOFA and Schedules B and H.

85.      On October 20, 2008, Plaintiff filed his Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 727 and to Determine Dischargeability of Certain Indebtedness ("Discharge Complaint").

86.      On March 17, 2009, Plaintiff and John Litzler, the Chapter 7 Trustee ("Trustee"), filed their Joint Motion to Approve Compromise and Settlement Agreement ("Compromise").

87.     The Compromise included transfer of the Policy by the Bankruptcy Estate to Plaintiff.

88.     After approval of the Compromise was sought, Defendant, on March 30, 2009, amended his Schedules for the third time by filing his Amended Claim of Exemptions ("Amended Exemptions").  This time the Debtor claimed, for the first time, that the Policy was exempt.

89.     On April 3, 2009, the Debtor filed his Objection to the Compromise.

90.     On May 26, 2009, the Bankruptcy Court approved the Compromise whereby, among other things, the Trustee was to transfer to Plaintiff an absolute assignment of all rights, title, and interest in and to all non-exempt assets, real, personal and intangible, of the bankruptcy estate of Defendant Kercheval, then held by Trustee under Bankruptcy Case No. 08-33516 HDH-7.

## II. CONCLUSIONS OF LAW

1.     Any findings of fact which are properly conclusions of law are  incorporated as conclusions of law and *vice versa*.

## Section 523(a)(6)

2.     Mr. Rucker objects to the dischargeability of the debt owed to him by Defendant Kercheval pursuant to the guaranty.  Section 523(a)(6) provides in relevant part,

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

3.     In order for conduct to qualify as willful and malicious, the debtor must act with "either an objective substantial certainty of harm or a subjective motive to cause harm." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (quoting *Miller v. J.D.*

*Abrams, Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998)). Injuries that are negligently or recklessly inflicted are insufficient to meet the requirements of section 523(a)(6); they must be wilful. *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *see also Raspanti v. Keaty (In re Keaty),* 397 F.3d 264, 269-270 (5th Cir. 2005).

4.  Wilful and malicious injuries "are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6)." *International Beauty Products, LLC v. Beveridge (In re Beveridge)*, 2009 WL 2591143 *11 (Bankr. N.D. Tex., August 18, 2009) (citing 4 COLLIER ON BANKRUPTCY ¶ 523.12(4) (15th ed. rev. 2003)). "Willful conversion of another's property falls within section 523(a)(6)." *Id.* (Citing *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 486 (5th Cir. 1986).

5.  The burden is on the Plaintiff to prove, by a preponderance of the evidence, that each of the elements under subsections 523(a)(6) have been met. *See Grogan v. Garner,* 498 U.S. 279, 286-88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

6.  Mr. Rucker bases the § 523(a)(6) denial of dischargeability of his claim against Defendant Kercheval in his complaint on two grounds: (1) Defendant Kercheval caused certain PFI accounts to be transferred to KD Factors for less than reasonably equivalent value with the intent to cause harm to Rucker; and (2) Defendant Kercheval willfully and maliciously caused injury to Rucker by changing the ownership of the Policy, and by amending the Policy to remove PFI from the list of beneficiaries.

7.  Witnesses for Defendant Kercheval credibly testified that PFI was essentially out of cash and unable to factor receivables for its customers in the September-October 2007 period, that it transferred most of its accounts to other factors, and, that in the factoring business,

customers will immediately go to other factors with their business if one is unable to continue factoring receivables for them. Defendant Kercheval's testimony on this point was supported by Kirby Kercheval and by various communications made during this time period to Mr. Rucker and others regarding the dire financial situation of PFI.

8.      Plaintiff did not prove that the accounts were transferred for less than reasonably equivalent value, and Defendant showed that the credit received from Rediscounters and the funds from KD Factors were used to reduce the first lien, which actually represented a benefit to Plaintiff, the second lien holder.

9.      A witness for the Defendant credibly testified that the Policy was a term policy with no cash value, and, that at the time that the transfer of ownership was made, PFI was unable to continue paying the premiums due on the Policy. The evidence was unclear as to the "value" of the Policy, and therefore, the Court makes no findings on this point. Mr. Rucker, who claims he was damaged by the transfer of the Policy, had the burden of proof on this issue, and offered no credible testimony as to the actual value.

10.     Plaintiff did not meet his burden to prove that these transfers were made with either an objective substantial certainty of harm, or a subjective motive to cause harm, but rather the evidence presented at trial indicates that, as to the transfer of accounts, Defendant Kercheval was trying to make the best out of a bad situation. Further, because Plaintiff did not show that the transfers of accounts were for anything other than reasonably equivalent value, and did not prove that any harm to Plaintiff by the transfer of the Policy was done willfully by Defendant Kercheval, his objection to the dischargeability of the debt owed to him by Defendant Kercheval under § 523(a)(6) must be denied. As to the Policy, the primary

problem with Mr. Rucker's case is that he could not quantify the value of this term insurance policy.

## Section 727(a)(4)(A)

11.    Mr. Rucker also asserts that Defendant Kercheval's discharge should be denied pursuant to § 727(a)(4). Under § 727(a)(4)(A) of the Bankruptcy Code, "The court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A).

12.    The creditor must prove that (I) the Debtor made a statement under oath; (ii) the statement was false; (iii) the Debtor knew the statement was false; (iv) the Debtor made the statement with fraudulent intent; and (v) the statement materially related to the bankruptcy case. *Cadle Company v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)*; Cadle Company v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

13.    False oaths may be in the form of either false statements or omissions on the schedules and statements of financial affairs, or false statements by the debtor during the course of the bankruptcy proceedings. *Id*. "Circumstantial evidence may be used to prove fraudulent intent and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *In re Duncan*, 562 F.3d at 695 (citing *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001).

14. The subject matter of a false oath is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property. *In re Beaubouef*, 966 F.2d at 178.

15. "Under bankruptcy law, a creditor objecting to the debtor's discharge bears the initial burden of production to present evidence that the debtor made false statements. If the plaintiff establishes a prima facie case, then the burden shifts to the debtor to present evidence that he is innocent of the charged offense." *In re Duncan*, 562 F.3d at 695 (citations omitted).

16. As pled in his Complaint, Plaintiff's 727(a)(4) claim is based on Defendant Kercheval's omission of the execution of a Warranty Deed which allegedly transferred the Knox Property to Defendant Kercheval's ex-wife, and the waiver in the Warranty Deed of the $75,000.00 due to him from the sale of the Knox Property, which occurred more than a year before the bankruptcy case was filed.

17. The Warranty Deed was signed by Defendant Kercheval over fifteen months prior to filing his bankruptcy case. Defendant Kercheval credibly testified that the omission from his schedules was inadvertent, and that, at the time of execution of the Warranty Deed, he did not understand that a transfer was being made to his wife, since the property had been awarded to her as part of a divorce proceeding years before. Defendant Kercheval testified that the execution of the Warranty Deed was to satisfy title concerns. Further, he disclosed this transaction at his § 341 meeting and quickly amended his schedules.

18. The fact that the initial omission from the schedules relates to a transaction settled by a divorce decree some six years prior to the transfer helps Defendant Kercheval.

19. This Court observed Defendant Kercheval and his testimony regarding the Warranty Deed, and believes his omission of this item was inadvertent.

20. Based on the evidence submitted at trial, the Court finds no fraudulent intent on the part of Defendant Kercheval; and therefore, the objection to his discharge will be denied.

**Objection to Debtor's Claim of Exemption**

21. The parties previously agreed to try Plaintiff's Objection to Debtor's Amended Claim of Exemption for the Policy in tandem with the Complaint in this adversary proceeding.

22. The Objection is based essentially on two grounds asserted by the Plaintiff: (1) the Debtor could never claim the Policy as his own asset, because he neither had authority to (a) transfer this Policy, which belonged to PFI, to himself; nor (b) change the beneficiaries of this insurance to benefit solely his family. Thus, there is nothing to be exempted from the Debtor's bankruptcy estate; and (2) in the alternative, the Debtor's claimed exemption should be denied because of the Debtor's misconduct, bad faith, and outright fraudulent conveyance in transferring ownership of the Policy.

23. The Court finds that the first ground would be more properly brought in a separate proceeding to either recover a fraudulent transfer by PFI or to determine ownership of the Policy. Therefore, it will address the alternative ground that the exemption was claimed in bad faith.

24. Federal Rule of Bankruptcy Procedure 4003(c) provides that "[t]he objecting party has the burden of proving that the exemptions are not properly claimed."

25. Amendments to exemptions are generally allowed liberally under Federal Rule of Bankruptcy Procedure 1009. However, leave to amend may be denied if there is a showing

of the debtor's bad faith or of prejudice to the creditors. *In re Williamson*, 804 F.2d 1355, 1358 (5th Cir. 1986); *In re Sandoval*, 103 F.3d 20, 22 (5th Cir. 1997). A finding of bad faith usually requires some form of deception, such as an effort to mislead creditors or to conceal assets. *See In re Park*, 246 B.R. 837, 841 (Bankr. E.D. Tex. 2000); *McFatter v. Cage*, 204 B.R. 503, 508 (S.D. Tex. 1996). For a court to find prejudice to creditors, it is not enough that the plaintiff show that the creditors would receive a lower distribution from debtor's estate if Debtor's newly asserted exemption was sustained. It involves creditors adopting a litigation position, to their detriment, in reliance upon conduct of the debtor. *McFatter v. Cage*, 204 B.R. 503, 508 (S.D. Tex. 1996).

26.     Here, the Debtor amended his schedules three times after the § 341 meeting, at which the Policy was discussed. He did not list the Policy as exempt until March 30, 2009, eight months later after his bankruptcy case was filed, and immediately after PFI had agreed to transfer its rights in the Policy to Rucker, in partial satisfaction of Rucker's judgment. More importantly, Mr. Rucker and the Trustee had entered into the Compromise and filed a motion seeking its approval.

27.     There was evidence presented at trial that the Policy had some value, although this Court is unable to determine from the record exactly what the value is. Certainly, the parties each believe the Policy has value, for they have fought hard over it.

28.     The Court believes that the claim of exemption for the Policy simply comes too late in the proceedings. To allow the Debtor to exempt the Policy now, after the Compromise, and many months after the case was filed, would be unfair. It appears to the Court that the belated claim of exemption was made in an attempt to prejudice Rucker's claim to the Policy

obtained in Rucker's Compromise with the Trustee. Therefore, the Debtor's claim of exemption will be denied.

### ###END OF FINDINGS AND CONCLUSIONS###